***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their *Page 2 
representatives, the Full Commission upon reconsideration of the evidence based after the deposition testimony of Dr. Allan Lieberman, affirms with some modification the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the injury giving rise to this claim, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. At the time of the injury giving rise to this claim, defendant-employer was insured by Hartford Insurance Company.
3. All parties have been correctly designated, there is no question as to misjoinder of parties, and the parties are subject to the jurisdiction of the North Carolina Industrial Commission.
4. All applicable Industrial Commission forms including, but not limited to, Forms 18, 19, 22, 33, 33R and 61 may be received in evidence.
5. Plaintiff's average weekly wage was $632.68, yielding a compensation rate of $421.79, pursuant to a stipulation agreed upon by the parties on 16 August 2005.
6. The issues for determination are:
 a. Whether plaintiff has sustained a compensable injury by accident/ occupational disease?
 b. To what, if any, benefits is plaintiff entitled?
 b. Whether plaintiff is permanently and totally disabled? *Page 3 
 d. Whether defendants are entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
 *********** EXHIBITS
1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: Discovery responses
 c. Stipulated Exhibit #3: Form 22
 d. Stipulated Exhibit #4: Employment records
 e. Stipulated Exhibit #5: Material data sheets
 f. Stipulated Exhibit #6: Medicare set-aside
2. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
 a. Plaintiff's Exhibit #1: Blow up of Plaintiff's Exhibit #2, allowed for illustrative purposes
 b. Plaintiff's Exhibit #2: Photograph
 c. Plaintiff's Exhibit #3: Photograph
 d. Plaintiff's Exhibit #4: Photograph
 e. Plaintiff's Exhibit #5: Photograph
 f. Plaintiff's Exhibit #6: Photograph
 g. Plaintiff's Exhibit #7: Correspondence
3. Attached to the deposition of Dr. Matthew D. Acampora are the following Exhibits: *Page 4 
 a. Plaintiff's Deposition Exhibit #1: Medical records
 b. Plaintiff's Deposition Exhibit #2: Medical records
 c. Plaintiff's Deposition Exhibit #3: U.S. Dept. of Transportation records
 d. Plaintiff's Deposition Exhibit #4: Medical records
4. Attached to the deposition of Dr. John C. McIver are the following Exhibits:
 a. Plaintiff's Deposition Exhibit #1: Medical records
 b. Plaintiff's Deposition Exhibit #2: Chemical analysis
 c. Plaintiff's Deposition Exhibit #3: Medical records
5. Attached to the deposition of Dr. Marsha Ford are the following Exhibits:
 a. Defendants' Deposition Exhibit #1: Dr. Ford's curriculum vitae
 b. Defendants' Deposition Exhibit #2: Correspondence
 c. Defendants' Deposition Exhibit #3: Correspondence
6. Attached to the deposition of Dr. Allan Lieberman are the following Exhibits:
 a. Defendants' Deposition Exhibit #1: Dr. Lieberman's curriculum vitae
 b. Defendants' Deposition Exhibit #2: Material Safety Data Sheet
 c. Defendants' Deposition Exhibit #3: Chemical analysis
 d. Defendants' Deposition Exhibit #4: Chemical analysis
 e. Defendants' Deposition Exhibit #5: Chemical analysis
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 40 years old. He is originally from Zaire, Congo. He arrived in the United States in 1998. Prior to his *Page 5 
employment with defendant-employer, plaintiff worked at a company called Colonial Tin in Greensboro, North Carolina. Thereafter, he worked in a post office in Charlotte, North Carolina.
2. Defendant-employer is a business which sells and services copiers, printers and fax machines to large and small business clients. Plaintiff began his employment with defendant-employer as a service technician on 25 January 2000. Plaintiff's employment ended on 2 June 2004. Plaintiff was one of approximately 18 service technicians employed by defendant-employer from 2000 through 2004.
3. Plaintiff's duties as a service technician included troubleshooting, completing board repair work, running deliveries, refurbishing equipment (or rebuilding modules), and completing set-ups. Cleaning products were used occasionally on deliveries of machines; otherwise, the use of cleaning products was required only when refurbishing equipment (or rebuilding modules).
4. There is conflicting testimony regarding the cleaning products used by plaintiff in his job. Plaintiff's Exhibit #2 purports to be a photograph of all the products used by plaintiff; however, it was admitted at the hearing that some of the items in the photo were not used by plaintiff, but were kept in the same cabinet as the solutions he used. Defendants did admit that plaintiff used D-ink, Belt cleaner, Stoner Natural Citrus XENIT Cleaner, Stoner Anti-Static Glass Cleaner, Stoner Plastic Surface Cleaner and AQS Air (canned compressed air).
5. The room in which plaintiff worked was approximately 22 ½ feet by 16 ½ feet with 10 foot ceilings. The room had two doors located at either end of the room opposite from each other. The doors remained open most of the time. Other employees also used the room for job duties and as a walk-through to other areas of the business. Plaintiff did not testify as to the amount of time he actually spent using cleaning solutions during the course of a day. Co-workers of plaintiff estimated that approximately 10% of the day was spent cleaning machines. *Page 6 
6. On 19 March 2003, plaintiff presented to his family physician, Dr. Matthew D. Acampora, with complaints of anxiety associated with breathlessness, chest pain, dizziness, insomnia, and rapid heart rate that had been occurring for the previous six days. Dr. Acampora opined that plaintiff's exam was within normal limits and diagnosed plaintiff with shortness of breath, dizziness and chest pain that may be cardiac related.
7. On 7 August 2003, plaintiff returned to Dr. Acampora with dizziness, nausea, temporal headache and upper back pain. Again, plaintiff's test results and physical examination were deemed normal by Dr. Acampora. Plaintiff was diagnosed with dizziness, nausea, headache and low blood sugar.
8. Plaintiff returned to Dr. Acampora on 20 February 2004, with complaints of double vision, dizziness, nausea and short-term memory loss. Plaintiff attributed his symptoms to working in an unventilated area with chemicals. Plaintiff claimed the symptoms had been acute and persistent for a period of six months. Dr. Acampora examined plaintiff and was of the opinion that his exam was "completely normal." Because plaintiff claimed to be exposed to "significant chemicals" at work, Dr. Acampora advised him not to return to work.
9. Plaintiff's final visit to Dr. Acampora occurred on 25 February 2004. Plaintiff presented with complaints of headache, blurred vision and chest pain. Again, plaintiff gave a history of working "in a factory with chemicals." Again, a physical examination failed to reveal anything out of the ordinary, with the exception of elevated blood pressure. Dr. Acampora was unable to causally relate plaintiff's symptoms to exposure to chemicals.
10. On 9 March 2004, plaintiff presented to internal medicine expert, Dr. John C. McIver, with complaints of headaches, dizziness and light-headedness. Plaintiff gave a history of worsening symptoms on days he worked, with the symptoms abating on the weekends when he *Page 7 
was not working. Dr. McIver's examination of plaintiff was normal; however, based upon plaintiff's complaint of fume exposure, he felt that the symptoms were work-related. Dr. McIver suggested that plaintiff intermittently remove himself from the work environment to a fresh air area, and that he might ultimately need to change occupations.
11. On 25 March 2004, defendant-employer installed an exhaust fan in plaintiff's workplace in response to his complaints.
12. Plaintiff returned to Dr. McIver on 15 April 2004, with additional complaints of nausea and abdominal pain. Dr. McIver prescribed medication and gave plaintiff a note for missed work from 6 April 2004 through 8 April 2004. In addition, Dr. McIver referred plaintiff to a chemical specialist at plaintiff's request.
13. Plaintiff's final day of actual work for defendant-employer was 28 May 2004. His last day of employment with defendant-employer was 2 June 2004.
14. On 2 June 2004, plaintiff presented to Dr. Allan Lieberman at the Center for Occupational and Environmental Medicine in Charleston, South Carolina. Dr. Lieberman was tendered as an expert in occupational/non-occupational environmental medicine and toxicology. Dr. Lieberman is board-certified in pediatrics. Additionally, he testified that he took courses in occupational and environmental medicine until he "eventually felt a level of expertise." Dr. Lieberman is not board-certified in toxicology, neurology, gastroenterology, or cardiology. Dr. Lieberman testified that his opinions were "based upon 10,000 cases that [he had] reviewed." When discussing his prior cases, Dr. Lieberman mentioned only mold and pesticide injuries, and stated that the majority of his cases are non-occupational.
15. Dr. Lieberman testified that he did not perform any MRIs, CT scans, EKGs, or EMGs at the one-time evaluation of Plaintiff. The only test Dr. Lieberman testified that he *Page 8 
performed was the Romberg test, which he described as "you ask the patient to stand with his two feet together and close his eyes and see if they fall."
16. At the evaluation with Dr. Lieberman, plaintiff completed a life history questionnaire. In this questionnaire, plaintiff stated that he had exposure to X-rays, radiation, smoke, natural gas fuel, and excessive heat or cold temperatures while working for defendant-employer. However, at the hearing plaintiff admitted that he did not have exposure to X-rays or radiation, and that smoking was not allowed at defendant-employer's facility. When asked about his exposure to natural gas, plaintiff responded that he did not know. When questioned about exposure to extreme heat or cold temperatures, plaintiff admitted that his air-conditioned room had a standard room temperature that could be increased or lowered. Defendants' witnesses denied that plaintiff would have been exposed to X-rays, radiation, smoke, natural gas fuel, and excessive heat or cold temperatures as a service technician.
17. Dr. Lieberman reviewed labels from products that plaintiff claimed he used at work and was of the opinion that they included "multiple volatile compounds, alcohols, petroleum distillates, styrene, perc, citrus extracts, hydrocarbon propellants, as well as carbon black."
18. Dr. Lieberman diagnosed plaintiff with injuries to and dysfunction of multiple organs and systems resulting from exposures to multiple petroleum distillates, including his nervous system, cardiovascular system and gastrointestinal system. Dr. Lieberman opined that the damage to plaintiff's nervous system resulted in memory loss, confusion, anxiety/depression, poor concentration, drunk feeling, episodes of unconsciousness, dizziness, double vision, loss of libido, inability to walk in the dark, abnormal cerebella functioning, a positive Rhomberg and headaches. He further opined that the damage to plaintiff's cardiovascular system caused arrhythmia and that *Page 9 
plaintiff's chronic abdominal pain, heartburn, constipation/obstipation and pancreatitis indicated damage to his gastrointestinal system.
19. Dr. Lieberman based his conclusions on plaintiff's contention that his job consisted of "servicing copy and fax machines in a small windowless and poorly ventilated room." Plaintiff a reported to Dr. Lieberman that within two months of beginning work for defendant-employer, he began developing "falling out to unconsciousness associated with pain in his chest, left sided numbness, daily headaches and an ever-present drunk like feeling and as the years went by he noted loss of memory, increasing anxiety and depression, mental confusion, dizziness and double vision."
20. Plaintiff reported to Dr. Lieberman that he cleaned three to four machines a day and that he used glass cleaner, plastic surface cleaner, belt cleaner and aerosol on a daily basis. Dr. Lieberman opined that it was significant that plaintiff had daily exposure to the chemicals and that there is no other explanation for plaintiff's symptoms other than his known exposure to neurotoxic and cardiotoxic chemicals.
21. Dr. Lieberman further opined to a reasonable degree of medical certainty that the chemicals to which plaintiff was exposed at work were a significant contributing factor in the development of plaintiff's neurotoxicity, cardiotoxicity, and the reactive intestinal dysfunction syndrome. Furthermore, Dr. Lieberman opined within a reasonable degree of medical certainty that the chemicals to which plaintiff was exposed at work placed plaintiff at an increased risk greater than the general public of developing neurotoxicity, cardiotoxicity, and reactive intestinal dysfunction syndrome.
22. The record shows that plaintiff spent a significant amount of time doing tasks other than those involving exposure to cleaning fluids. Dr. Liberman's description of plaintiff's *Page 10 
workspace is not supported by the evidence, nor is the allegation that plaintiff's symptoms began within two months of beginning work for defendant-employer in January 2000. Rather, the record shows that plaintiff's symptoms began approximately three and one half years after he began his employment with defendant-employer. In addition, the record does not support plaintiff's allegations of exposures to many of the items he reported to Dr. Lieberman.
23. In reviewing the report of Dr. Lieberman, Dr. McIver opined that although he is not a chemical exposure expert, it "seems to be a possibility that more than likely" the exposure caused the nervous system conditions listed in Dr. Lieberman's report. Dr. McIver did not offer an opinion as to a causal connection between the exposure and plaintiff's abdominal pain, constipation and elevated amylase level (pancreatitis).
24. Plaintiff returned to Dr. McIver on 13 July 2004. Dr. McIver opined that plaintiff was not disabled from all work, but recommended that plaintiff change employment to a job without chemical exposure. Dr. McIver also recommended a CT scan due to plaintiff's continuing complaints of headaches, vision problems and dizziness, despite being out of work since 28 May 2004. The CT scan was performed and Dr. McIver opined the results were normal.
25. Dr. Marsha Ford, a board-certified expert in medical toxicology, internal medicine and emergency medicine, employed by Carolinas Medical Center and Carolinas Poison Center, reviewed and researched the chemicals in the products used by plaintiff. She also examined all of plaintiff's medical records, the Material Safety Data Sheet (MSDS sheets), plaintiff's workroom at defendant-employer's place of business and the actual products used by plaintiff.
26. Dr. Ford opined that exposure to the substances contained in the products used by plaintiff would not produce chronic neurological, gastrointestinal, or cardiac effects and that the *Page 11 
substances would not increase his risk for developing chronic neurological, gastrointestinal or cardiac effects over that of the general public. She further opined that while plaintiff would not have sustained any chronic symptoms from products used at work, it was possible that he could have had some acute symptoms while using some of the products at work. However, these acute symptoms would have occurred briefly while plaintiff was at work and actually using the products and would not have been experienced while he was home and away from the products.
27. It is noted that plaintiff's reported symptoms continued long after he ceased working for defendant-employer and continued at least until the date of the hearing before the Deputy Commissioner on this matter, more than a year since his last exposure to any chemicals at defendant-employer's workplace.
28. Based upon her level of expertise and her review of the records, the workplace and the actual cleaning products in the workplace, the Full Commission finds Dr. Ford's testimony more persuasive than that of Dr. Lieberman and gives greater weight to the testimony of Dr. Ford.
29. Based primarily upon the testimony of Dr. Ford and also the inability of Dr. Acampora to causally relate plaintiff's symptoms to exposure to chemicals in the workplace, the Full Commission finds that there is insufficient evidence in the record to support a causal connection between plaintiff's work-related duties and his current physical condition.
30. Plaintiff had reasonable grounds to bring this action.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following: *Page 12 
 CONCLUSIONS OF LAW
1. Neurotoxicity, cardiotoxicity, and reactive intestinal dysfunction syndrome are not occupational diseases specifically enumerated under N.C. Gen. Stat. § 97-53. Therefore, plaintiff must proceed under N.C. Gen. Stat. § 97-53(13) in order to prove he contracted a compensable occupational disease. To prove a compensable occupational disease pursuant to N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that his condition meets three criteria: (1) the condition is characteristic of persons engaged in the particular trade or occupation in which the plaintiff is engaged, (2) the condition is not an ordinary disease of life to which the general public is equally exposed outside of this employment, and (3) there is a causal connection between the disease and the plaintiff's employment in that the employment significantly contributed to or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359,365 (1983). The first two requirements of this test are met if Plaintiff can show that the employment created an increased risk of contracting the particular disease than the general public. Id. at 94,301 S.E.2d at 365. In the instant case, Dr. Ford, an expert in medical toxicology, internal medicine and emergency medicine, reviewed and researched the chemicals in the products used by plaintiff. She also examined all of plaintiff's medical records, the MSDS sheets, plaintiff's workroom at defendant-employer's place of business and the actual products used by plaintiff. Dr. Ford opined that exposure to the substances contained in the products used by plaintiff would not produce chronic neurological, gastrointestinal, or cardiac effects and that the substances would not increase his risk for developing chronic neurological, gastrointestinal or cardiac effects over that of the general public. She further opined that while plaintiff would not have sustained any chronic symptoms from products used at work, it was possible that he could have had some acute symptoms while *Page 13 
using some of the products at work. However, these acute symptoms would have occurred briefly while plaintiff was at work and actually using the products and would not have been experienced while he was home and away from the products. Also, Dr. Acampora was unable to causally relate plaintiff's symptoms to exposure to chemicals. Finding Dr. Ford and Dr. Acampora's opinions more persuasive than Dr. Lieberman's, the Full Commission concludes based on the greater weight of the evidence, plaintiff has not proven that there is a causal connection between his symptoms and underlying condition and his exposure to chemicals at work.
2. Plaintiff's claim that he contacted an occupational disease due to exposure to chemicals at work should be denied.
3. As plaintiff had reasonable grounds to bring this action, defendants are not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 ORDER
1. Under law, plaintiff's claim for benefits under the Act must be and is hereby DENIED.
2. Each side shall bear its own costs. Defendants shall pay any outstanding expert witness fees upon submission and approval by the Full Commission.
This the __ day of August 2007.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER *Page 14 
CONCURRING:
S/_____________ BUCK LATTIMORE CHAIRMAN
S/_____________ DANNY LEE McDONALD COMMISSIONER